# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| PHYSICIANS HEALTHSOURCE, INC., an Ohio corporation, individually and on behalf of similarly situated persons, | |
| Plaintiff, | Case No. 12-cv-05105 |
| v. | |
| | Hon. Joan B. Gottschall |
| | Magistrate Judge Sheila M. Finnegan |
| A-S MEDICATION SOLUTIONS, LLC, JAMES BARTA, WALTER HOFF and JOHN DOES 1-10, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Eric L. Samore
Albert Bower
Yesha Hoeppner
SMITHAMUNDSEN LLC
150 N. Michigan Avenue #3300
Chicago, IL 60601
(312) 894-3251

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    BACKGROUND ....................................................................................5

    A.   Allscripts, LLC.............................................................................5

         1.   Products and Services ....................................................5

         2.   Salesforce ......................................................................6

         3.   Fax Communication.......................................................6

         4.   Allscripts's Practice Of Obtaining Consent Before Sending Fax Advertisements ...............................................8

    B.   A-S Medication's Purchase Of Allscripts's MSG .......................9

    C.   A-S Medication Was A Continuation Of Allscripts's MSG.....................10

    D.   A-S Medication's Practice Of Sending Fax Advertisements Only To Its Customers, Allscripts's Customers And Others Interested In Receiving Faxes From It ..................................................................12

    E.   Plaintiff's Consent To Receive Faxes.......................................13

         1.   To Allscripts...............................................................13

         2.   To A-S Medication ......................................................13

    F.   Putative Class Members' Consent To Receive Faxes From Allscripts And A-S Medication ..........................................14

    G.   The Fax At Issue ........................................................................16

III.   ARGUMENT .......................................................................................18

    A.   Requirements For Class Certification ........................................18

    B.   Consent—the Predominant Issue—Must Be Resolved Individually For Each Putative Class Member..................................................20

    C.   The Retroactive Waiver Applies To The Faxes At Issue...............25

IV.   CONCLUSION....................................................................................29

i

## **TABLE OF AUTHORITIES**

### **CASES**

*Aderhold v. Car2go N.A., LLC*, No. C13-489RAJ, 2014 WL 794802
(W.D. Wash. Feb. 27, 2014) ...................................................................22

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689
(1997) ..............................................................................................19

*Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100 (N.D. Cal. 2014) *aff'd*, No. 14-55293,
2016 WL 424778 (9th Cir. Feb. 3, 2016) ...........................................3, 23

*Bais Yaakov of Spring Valley v. Graduation Source, LLC*, No. 14-CV-3232
(NSR), 2016 WL 1271693 (S.D.N.Y. Mar. 29, 2016)...........................27, 28

*Baisden v. Credit Adjustments, Inc.,* 813 F.3d 338 (6th Cir. 2016)..................................23

*Chavez v. Advantage Group*, 959 F. Supp. 2d 1279 (D. Colo. 2013).............................24

*Fields v. Mobile Messengers Am., Inc.*, No. C 12-05160 WHA,
2013 WL 6073426, (N.D. Cal. Nov. 18, 2013) .........................................20

*G.M. Sign, Inc. v. Brink's Mfg. Co.,* No. 09 C 5528, 2011 WL 248511
(N.D. Ill. Jan. 25, 2011) ...............................................................4, 19, 20

*General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982)............................19

*Harper v. Sheriff of Cook Co.,* 581 F.3d 511 (7th Cir.2009) ............................................18

*Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92 (N.D. Ill. 2013)............................4, 20

*Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813
(N.D. Ill. July 7, 2014)................................................................3, 22, 23

*New England Carpenters Health Benefits Fund v. First Databank, Inc.,*
244 F.R.D. 79 (D.Mass.2007)...............................................................19

*Olney v. Job.com, Inc.*, 2014 WL 1747674 (E.D. Cal. May 1, 2014)......................3, 22, 23

*Oshana v. Coca–Cola Co.,* 472 F.3d 506 (7th Cir.2006) .................................................18

*Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 65 F. Supp. 3d 482
(W.D. Mich. 2014)..............................................................................28

*Simon v. Healthways, Inc.,* No. CV1408022BROJCX, 2015 WL 10015953,
(C.D. Cal. Dec. 17, 2015) .................................................................................5, 27, 28

*Spring Valley v. Graduation Source, LLC*, No. 14-CV-3232 (NSR), 2016 WL
1271693, (S.D.N.Y. Mar. 29, 2016) ...........................................................................5

*Schwartz-Earp v. Advanced Call Ctr. Techs., LLC*, No. 15-CV-01582-MEJ,
2016 WL 899149 (N.D. Cal. Mar. 9, 2016)................................................................23

*Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672 (7th Cir.2001).......................................19

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ...................................................19

## STATUTES, RULES AND REGULATIONS

Fed. R. Civ. P. 23(b)(3)...................................................................................................4, 5

## OTHER AUTHORITIES

In re Rules and Regs. Implementing Tel. Consumer Protection Act of 1991,
23 FCC Rcd. 559 (Jan. 4, 2008).................................................................................23

In re Rules and Regs. Implementing Tel. Consumer Protection Act of 1991,
27 FCC Rcd. 1830 (Feb. 15, 2012) ...........................................................................23

In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act
of 1991, Junk Fax Prevention Act of 2005, 21 F.C.C. Rcd. 3787 (2006).........................26

In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act
of 1991, 30 F.C.C. Rcd. 7961 (2015)..................................................................23

In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act
of 1991, 30 F.C.C. Rcd. 8598 (2015)................................................................5, 26

In The Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act
of 1991, 29 F.C.C. Rcd. 13998 (2014)..............................................................26

Matter of Groupme, Inc./skype Commc'ns S.A.R.l Petition for Expedited
Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot.
Act of 1991, 29 F.C.C. Rcd. 3442 (2014)...................................................................4, 24

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| PHYSICIANS HEALTHSOURCE, INC., an Ohio corporation, individually and on behalf of similarly situated persons, | |
| Plaintiff, | Case No. 12-cv-05105 |
| v. | |
| | Hon. Joan B. Gottschall Magistrate Judge Sheila M. Finnegan |
| A-S MEDICATION SOLUTIONS, LLC, JAMES BARTA, WALTER HOFF and JOHN DOES 1-10, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION**

Defendants, A-S Medication Solutions, LLC ("A-S Medication"), LLC, James Barta, and Walter Hoff (collectively, "Defendants"), by and through their attorneys, respectfully request that this Court deny Plaintiff's Motion for Class Certification (Dkt. ## 147, 147-1). In support of their opposition, Defendants state as follows:

**I.      INTRODUCTION**

Prior express consent—the predominant issue in this case—can only be resolved through inquiry into the facts and circumstances of each individual putative class member's consent to receive fax advertisements. Where, as here, the relevant facts and circumstances establish that consent must be resolved individually for each putative class member, class certification is properly denied.

A-S Medication's predecessor—Allscripts, LLC ("Allscripts")—obtained prior express consent from putative class members to send them fax advertisements. (*See* Transcript of Brian Moffett's 30(b)(6) Corporate Representative Deposition in *Physicians Healthsource v. A-S*

*Medications Solutions, et. al.*, ("Moffet *A-S* Dep."), attached here to as **Exhibit A**, pp. 45-46; 125). When Allscripts obtained such consent, it marketed and sold a variety of healthcare-related products and services, including electronic prescribing solutions, electronic medical records software, and practice management software. (*See* Marketing Agreement, dated Mar. 16, 2009, attached hereto as **Exhibit B**, pp. 1-2). At the time, Allscripts's business also included a pre-packaged medication solutions business group—the Medication Services Group (the "MSG")—that marketed and sold pre-packaged medications and related dispensing software. (*See* Asset Purchase Agreement ("APA"), dated Mar. 2, 2009, attached hereto as **Exhibit C**, p. 6).

When the MSG was part of Allscripts, Allscripts's centralized marketing and sales staff marketed and promoted MSG's products and services. (*See* Affidavit of John Gregory Cull ("Cull Aff."), attached hereto as **Exhibit D**, ¶ 3). This included occasionally sending faxes advertising MSG's products and services to Allscripts's current and potential customers. (*Id.* ¶¶ 3-4). Prior to sending any faxes, Allscripts obtained consent from its customers and potential customers to send the fax advertisements. (Moffet *A-S* Dep., pp. 45-46; 125; Affidavit of Lindsey Williams ("Williams Aff."), attached hereto as **Exhibit E**, ¶¶ 2-3; Affidavit of Jeannine Oliver ("Oliver Aff."), attached hereto as **Exhibit F**, ¶¶ 2-3). The scope of the consent included faxes advertising products and services sold by Allscripts, including products marketed and sold by Allscripts's MSG. (*Id.*).

A-S Medication is, for all practical purposes, a continuation of Allscripts's MSG. In March 2009, A-S Medication purchased all of the assets primarily used in Allscripts's MSG business and assumed substantially all of the liabilities of the business. (*See* APA, p. 5). A-S Medication assumed MSG's contractual obligations to prior MSG customers. (*See, e.g.,* St. Louis County Administration Letter, dated April 9, 2009, attached hereto as **Exhibit G**). And, MSG's

customers were directed to pay outstanding accounts receivable balances owed to MSG to A-S

Medication. (*See* Accounts Payable Letter, dated May 1999 [*sic*], attached hereto as **Exhibit H**).

As one former MSG customer explained, A-S Medication "appeared to me to be a continuation

of the same business." (Oliver Aff., ¶ 7).

Because A-S Medication was a continuation of Allscripts's MSG, the consent obtained

by Allscripts may be broad enough to encompass faxes sent by A-S Medication marketing the

same types of products and services previously offered by the MSG. Affidavits from putative

class members confirm that they considered their consent to be broad enough to include consent

to A-S Medication. (*See, e.g.,* Oliver Aff., ¶ 7; Williams Aff., ¶¶ 2-5). As Ms. Oliver explained,

> when [Oliver Family Health] provided its fax number to Allscripts, it agreed to
> and consented to receive faxes from Allscripts regarding Allscripts' products and
> services. I considered the consent that I previously provided to Allscripts
> extended to A-S Medications as it appeared to me to be a continuation of the same
> business.

(Williams Aff., ¶ 7).

The putative class members' affidavits confirm that, in this case, consent must be

resolved individually for each putative class member based on the purpose of the consent and the

context in which consent was provided. *See Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL

3056813, at *4 (N.D. Ill. July 7, 2014)("to the extent the FCC's orders establish a rule, it is that

the scope of a consumer's consent depends on its context and the purpose for which it is

given."). Courts have recognized that consent can be broad enough to extend to third-parties.

*See, e.g., Olney v. Job.com, Inc.*, 2014 WL 1747674, at *6 (E.D. Cal. May 1, 2014)("[a]n

individual may indirectly provide a third-party with express consent to be called under the

TCPA."); *Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100, 1107 (N.D. Cal. 2014) *aff'd*, No. 14-55293,

2016 WL 424778 (9th Cir. Feb. 3, 2016) (plaintiff who voluntarily provided cell phone number

to airline "consented to be contacted on her cellphone about flight-related matters," and text message sent by airline's third-party vendor offering to provide flight information "fell within the scope of her 'prior express consent.'"). This is consistent with the Federal Communication Commission ("FCC")'s position that consent may extend to third-parties. *See* Matter of Groupme, Inc./skype Commc'ns S.A.R.l Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 29 F.C.C. Rcd. 3442, 3446 (2014)("consent to be called at a number in conjunction with a transaction extends to a wide range of calls 'regarding' that transaction, even in at least some cases where the calls were made by a third party.").

Because consent cannot be resolved through common or class-wide proof, Plaintiff cannot satisfy the class certification prerequisite that common questions of fact and law predominate over individual ones. *See* Fed. R. Civ. P. 23(b)(3). A number of courts have denied class certification where, as here, consent could only be resolved through consideration of evidence unique to each putative class member. *See, e.g.*, *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013)("Since there is no way to employ generalized proof to prove consent, or lack thereof, [plaintiff] has failed to meet its burden under Rule 23(b)(3) because individual issues predominate over common ones."); *G.M. Sign, Inc. v. Brink's Mfg. Co.,* No. 09 C 5528, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011)(finding that it would have to engage in class-member-specific inquiry to resolve issue of consent and established business relationship, court held the individual questions predominated over common questions of law or fact).

Plaintiff attempts to avoid the issue of consent by arguing that consent is irrelevant because the faxes at issue did not contain an opt-out notice as required by 47 C.F.R. 64.1200(a)(4)(iv). (*See* Dkt. # 147-1, p. 9). Plaintiff's argument should be rejected. As Plaintiff

acknowledges, the Consumer and Governmental Affairs Bureau of the FCC—the agency charged with administering the Telephone Communications Protection Act ("TCPA")—granted A-S Medication a retroactive waiver of the requirement that opt-out language be included on faxes sent with prior express consent. (*Id*. at 9-10). Plaintiff does not challenge the validity of the waiver, but instead argues that the waiver does not apply in private litigation.(*Id.* at 10). Plaintiff's argument is contrary to: (1) the plain language of the waiver, and (2) cases applying the waiver in private litigation. *See* In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 ("Bureau Order"), 30 F.C.C. Rcd. 8598, 8609 (2015)("we dismiss arguments that by granting waivers while litigation is pending violates the separation of powers"); *Simon v. Healthways, Inc.,* No. CV1408022BROJCX, 2015 WL 10015953, at *7 (C.D. Cal. Dec. 17, 2015); *Spring Valley v. Graduation Source, LLC*, No. 14-CV-3232 (NSR), 2016 WL 1271693, at *5 (S.D.N.Y. Mar. 29, 2016).

Simply put, Plaintiff cannot meet its burden of establishing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," because the issue of consent in this case can only be resolved through individual inquiry for each putative class member. Fed. R. Civ. P. 23(b)(3). Therefore, Plaintiff's motion for class certification should be denied.

## II.    BACKGROUND

### A.    Allscripts, LLC

#### 1.    Products and Services

Allscripts, LLC ("Allscripts") is a company that "offer[s] an open, integrated portfolio of healthcare information technology solutions for hospitals, physician practices, and extended

care organizations." (*See* Allscripts's "About Us," *available at* http://www.allscripts.com/company/about-us (last visited Apr. 18, 2016). Allscripts has provided a variety of healthcare-related products and services since its incorporation in 1986. (*See id.*). One such healthcare solution was Allscripts's "pre-packaged medication fulfillment solutions business" (the "MSG"). (APA, p. 5). The MSG provided "both medications and software for dispensing and inventory control." (*Id.* at 5).

        2.    <u>Salesforce</u>

Since 2006, Allscripts has used a customer relationship management database called Salesforce. (Transcript of Brian Moffett's 30(b)(6) Corporate Representative Deposition in *Physicians Healthsource v. Allscripts Healthcare Solutions, Inc. and Allscripts Healthcare, LLC*, ("Moffett *Allscripts* Dep."), attached here to as **Exhibit I**, pp. 9-10; Moffet *A-S* Dep., p. 10). Allscripts uses Salesforce to keep track of data pertaining to its customers and prospective customers, such as their contact information, order history, account number, etc. (Moffet *A-S* Dep., pp. 9-10).

        3.    <u>Fax Communication</u>

One of the ways in which Allscripts communicated with its customers and prospective customers was via fax; in fact, until the more recent advent of email, faxing was the most common method of communication:

Q:     And prior to February of 2010, how common was fax communication between Allscripts and its customers and prospects?

A:     Prospects? I'll say for customers, it was very – it was very common. Again, a lot of these clients [customers] did not have e-mail addresses at that time….

Prospects, if the prospects wanted information, we would always ask for permission, and we would send it to them if they wanted it faxed. Again, e-mail was – you know, for a lot of these doctors, they were not

6

> technologically savvy. That's why they were trying to move to us to help
> them with that, and early on, fax was a big communicator.

(Moffet *A-S* Dep., pp. 42-43)(attorney objections omitted).

If Salesforce included a fax number for a particular entity, it was only because that entity voluntarily provided its fax number to Allscripts, along with permission to fax it something. (Moffet *Allscripts* Dep., p. 78; Moffet *A-S* Dep., pp. 41-42)(attorney objection omitted). The fax numbers would often be provided to Allscripts at the inception of contact between Allscripts and a customer or prospective customer:

> Q:     Just so I understand this. Clients [customers] and prospects had the
>        opportunity to volunteer their fax numbers to Allscripts at the start of the
>        relationship?
>
> A:     Yes.

(Moffet *A-S* Dep., p. 42; *see also id.* at 40-41).

Allscripts sent information about its various products and services—including the MSG—to its customers and prospective customers via fax. (Cull Aff., ¶¶ 3-4). If a customer was already using a particular Allscripts product or service, Allscripts would fax it information about other Allscripts products and services; and, Allscripts would also fax information about its products and services to entities that had not previously purchased or used any Allscripts products or services. (Moffet *A-S* Dep., pp. 123-125). The goal was to market a whole suite of Allscripts products and services—and product and service upgrades—to customers and prospects. (Moffet *Allscripts* Dep., pp. 121, 123). These fax advertisements were always sent with the recipient's permission, and often at the recipient's request:

> Q:     Did Allscripts' clients [customers] and prospects frequently request
>        information regarding Allscripts' products and services via fax?
>
> A:     Yes.

Q:      And I'll just ask this one more time. Allscripts, am I correct, had a policy and practice of obtaining consent before sending faxes of promotion or informational nature to clients and prospects?

A:      Yes.

(Moffet *A-S* Dep., pp. 45-46; 125)(attorney objection omitted).

4.      <u>Allscripts's Practice Of Obtaining Consent Before Sending Fax Advertisements</u>

Brian Moffett has been an Allscripts employee for 21 years and is familiar with Allscripts's business practices and how Allscripts keeps track of information pertaining to its customers and prospective customers in Salesforce. (Moffet *A-S* Dep., pp. 6, 9-10). He testified that Allscripts had a custom and practice of faxing advertisements only with the consent of the recipient:

Q:      You had said that Allscripts always got permission to send advertisement by fax, is that correct?

A:      That is correct.

(Moffet *Allscripts* Dep., p. 51; *see also id.* at 39-40, 43, 65-66, 125; Moffet *A-S* Dep., pp. 45-46).

Moffett explained that Allscripts's employees were trained to always ask permission before sending fax advertisements, and that part of asking for permission to send a fax would be to verify the fax number that Allscripts had for that entity in its Salesforce database:

Q:      Did Allscripts train its employees to request permission prior to sending faxes promoting Allscripts' goods and services?

A:      We always had that. We always ask permission.

Q:      Okay. And –

A:      Part of that was to validate the fax number [that the entity had previously provided to Allscripts].

(Moffet *A-S* Dep., p. 45; Moffet *Allscripts* Dep., p. 78).

Allscripts sent fax advertisements based off of information contained in its Salesforce database. Moffett explained that if an entity's fax number was present in Salesforce, it was because that entity had provided its fax number to Allscripts, along with permission to receive a fax advertisement:

> Q:     Does the fact that Allscripts have a fax number for a particular entity mean that they have permission to send them advertisements by fax?
>
> A:     The client would have given us that fax number. That wouldn't have come from any place. The client would have given us permission.

(Moffet *Allscripts* Dep., p. 78)(attorney objection omitted).

### B.     A-S Medication's Purchase Of Allscripts's MSG

In March 2009, A-S Medication purchased Allscripts's MSG, which "include[d] the offering of a formulary of pre-packaged medications and related dispensing software licensed to customers using FirstFill$^{TM}$ and TouchScript$^{TM}$, as currently conducted." (APA, p. 6). Specifically, A-S Medication purchased "all property and assets primarily used in or primarily held for use in" the MSG, which property and assets included, among other things:

> The machinery, equipment, furniture, tools, computer hardware and network infrastructure that are primarily used in or primarily held for use in the [MSG] Business….
>
> The inventories held for use primarily in the operation and conduct of the [MSG] Business, including raw materials, packaging materials, goods in process, finished goods, labels and supplies….
>
> The personnel, benefits and payroll records of the Transferred employees….
>
> [A]ll advertising and promotional materials, manuals and data, sales and purchase correspondence, lists of present and former suppliers, all customer information and data including lists of present and former customers….
>
> Any and all software, whether in source code, object code or human readable form (including any intellectual property rights related thereto and associated documentation), that is primarily used in or primarily held for use in the [MSG] Business, including FirstFill$^{TM}$ and TouchScript$^{TM}$…."

> All of the trade names, trademarks, service marks and other marks of [Allscripts] (including brand names, product names, logos, and slogans) and application therefor, other than, for the avoidance of doubt, any of the foregoing using or derived from "Allscripts," that are primarily used in or primarily held for use in the [MSG] Business….

(*Id.* at 13-15).

A-S Medication also assumed "all liabilities and obligations…primarily relating to or arising out of the [MSG] Business or the Assets…." (*Id.* at 17).

## C.     A-S Medication Was A Continuation Of Allscripts's MSG

After A-S Medication's purchase of Allscripts's MSG and its acquisition of all the assets and liabilities related thereto, A-S functioned—and was presented to the healthcare field—as a continuation of that MSG. (*See* Cull Aff., ¶ 5). As Walter Hoff, A-S's Chief Executive Officer and part owner explained:

> [W]e were a continuation of Allscripts's [MSG] business. We had a joint marketing arrangement with Allscripts. We were generally known on the street as Allscripts, even after the business because we were a continuation. We purchased the assets from Allscripts, the equipment, the contract. We assumed the employees. We're actually still in the same building as Allscripts, and we had a continuing relationship with our customers between us and Allscripts, so we were simply a continuation of the Allscripts business. Same business, different owners.

(Transcript of A-S 30(b)(6) Representative Deposition ("A-S 30(b)(6) Dep."), attached hereto as **Exhibit J**, pp. 17-18).

Pursuant to the Marketing Agreement between A-S Medication and Allscripts, executed in conjunction with the sale of the MSG, A-S Medication was granted a five-year license to use certain "Allscripts Trademarks" for the "marketing and sale of [A-S Medication] products in furtherance of the joint marketing relationship" and for "advertising and promotional material for the products that are covered by the marketing arrangement." (*See* Marketing Agreement, pp. 25-26, 38). A-S Medication's advertisements after its purchase of the MSG often described A-S

10

Medication as "Formerly Allscripts Medication Services Group" and included an approved Allscripts logo. (*See* Exemplar Advertisements, attached hereto as Group **Exhibit K**). In fact, the fax at issue in this case describes A-S as "formerly Allscripts Medication Services Group." (*See* Dkt. # 38-1, p. 2).

Furthermore, pursuant to the Marketing Agreement and for a period of five years, Allscripts would "use commercially reasonable efforts to cause any users of the 'meds.allscript.com' website to be automatically forwarded to a web address provided to Allscripts by [A-S Medication]." (Marketing Agreement, p. 35). A-S Medication representatives were also permitted to "actively participate in Allscripts's presentations and booths at all industry trade shows and events related to the [MSG] Business," and Allscripts would allow A-S Medication to "provide [MSG] material to be incorporated into Allscripts' web-x/web casts for customers and prospective customers planned in the normal course of Allscripts' marketing." (*Id.* at 33-34). Moreover, A-S Medication had, for a limited period of time and pursuant to the Marketing Agreement, remote access to Allscripts's Salesforce database. (Moffet *A-S* Dep., p. 36; Marketing Agreement, p. 35). Allscripts also would ""ensure that [A-S Medication] receives current monthly lists of Allscripts' clients with name, product names and sales history." (Marketing Agreement, p. 32). And, Allscripts would "actively participate and reasonably cooperate with [A-S Medication] in the development, integration, promotion and marketing of new non-manual products to existing and new clients of Allscripts" and would "[a]ctively promote and market current physician dispensing offering of [A-S Medication] as a compliment to Allscripts' current physician and clinical solutions programs and its new physician and clinical solutions programs." (*Id.*).

11

**D.     A-S Medication's Practice Of Sending Fax Advertisements Only To Its Customers, Allscripts's Customers And Others Interested In Receiving Faxes From It**

A-S Medication maintained a database called Alpha that contained information about its past and current customers; Alpha did not contain information about prospective customers or leads. (Transcript of Lauren McElroy Deposition ("McElroy Dep."), attached hereto as **Exhibit L**, pp. 30, 118, 191). Whenever a customer filled out an A-S Medication new account application form, the customer was asked whether it wanted to provide A-S Medication with its fax number. The customer was also asked whether it wanted A-S Medication to communicate with it via fax—or mail or email—regarding, among other things, A-S Medication's products and services. Customers' fax numbers and communication preferences were stored in A-S Medication's Alpha system. Hoff testified:

> A:     Then the client would be requested to fill out what's called a new application form where they had the option to put in their fax number or not put in their fax number, and they would sign the form; and when the client was actually set up, Chris at that time was doing setups, he would interview the client according to the various screens on Alpha. One of those screens required how did they want to communicate product information and other things along those lines so did they want to use fax or email or, you know, other forms.

> Q:     Okay. And how did you obtain fax numbers from your customers and new accounts?

> A:     So in that – two places. In that new account application form, the customer would fill it in or – and/or during the setup process Chris would be asking the question and they would be filling it in. The client or the prospect always had the chance of understanding whether or not they wanted to communicate by fax or not, they had the chance to explain it; or if they didn't want to give an email, they didn't have to give an email address either.

(Transcript of Walter Hoff Deposition ("Hoff Dep."), attached hereto as **Exhibit M**, pp. 67-69).

A-S Medication had a custom and practice of sending fax advertisements to only its customers—culled from the Alpha system based on their communication preference to receive faxes—Allscripts's leads that were provided pursuant to the Marketing Agreement between A-S Medication and Allscripts, Allscripts's customers, and/or to entities that had provided permission to receive fax advertisements. (McElroy Dep., pp. 10-11). A-S Medication's former Vice President of Marketing, Lauren McElroy, testified:

> A:    To your knowledge, was it A-S's custom and practice to only send faxes to its customers or people who were interested in receiving faxes, correct?

> A:    Correct, to my knowledge.

> Q:    That had indicated that they were interested in receiving faxes?

> A:    Yep.

(*Id.* at 122; *see also* Hoff Dep., p. 17).

### E.    Plaintiff's Consent To Receive Faxes

#### 1.    <u>To Allscripts</u>

Plaintiff is a former customer of Allscripts. (Transcript of Gearline Monhollen Deposition, attached hereto as **Exhibit N**, pp. 66-67). Allscripts and Plaintiff communicated on multiple occasions, including via fax. (*Id.* at 67-69). Plaintiff had provided Allscripts with permission to send it information via fax. (*Id.* at 68-69, 71-72). Plaintiff has also asked Allscripts to send it information about various products. (*Id.* at 87-90).

#### 2.    <u>To A-S Medication</u>

A-S Medication acquired Plaintiff's fax number from Allscripts's Salesforce database of customers. (*See, e.g.,* A-S 30(b)(6) Dep., pp. 15-16). To the extent that Plaintiff provided express permission to Allscripts to fax it information about various Allscripts's products, that consent

extended to A-S Medication, which acquired Allscripts's MSG and was a continuation thereof.

(*See supra* II.B-C, E.1). As Hoff explained:

> Q:     As you sit here today, what evidence do you have that the plaintiff provided express invitation or permission to A-S to be sent fax advertisements?
>
> A:     They gave their permission to Allscripts and we were a continuation of Allscripts business.
>
> ***
>
> Q:     [D]id Allscripts ever tell the customer or ask for permission to the customer for A-S to be able to send fax advertisements to them?
>
> A:     They didn't do it on a product-by-product basis, so we [Medication Business] would be one of the many products that they represent – had in their portfolio and represented on their website as available for sale. They wouldn't get permission for this product or that product. They get permission for the overall customer relationship.

(A-S 30(b)(6) Dep., pp. 17, 21-22).

###     F.     Putative Class Members' Consent To Receive Faxes From Allscripts And A-S Medication

Many putative class members are A-S Medication customers who were also Allscripts customers. (*See, e.g.,* Declaration of Victoria Smith ("Smith Dec."), attached hereto as **Exhibit O**, ¶¶ 2-3; Affidavit of Cathy Bolt Jones ("Jones Aff."), attached hereto as **Exhibit P**, ¶¶ 2, 4; Williams Aff., ¶¶ 2-5; Oliver Aff., ¶¶ 2, 5; Declaration of Debra Lucas, ("Lucas Dec."), attached hereto as **Exhibit Q**, ¶ 3). After A-S Medication purchased Allscripts's MSG, Allscripts's customers just started ordering medication from A-S Medication, because they considered A-S Medication to be a continuation of Allscripts's MSG. (*See, e.g.,* Oliver Aff., ¶¶ 4-7; Williams Aff., ¶¶ 3-5; Jones Aff., ¶¶ 2-5). For example, Victoria Smith, a medical technician for one of the putative class members, explained:

14

> Prior to purchasing medication from A-S [Medication], Riverview purchased medication from Allscripts, LLC....After A-S [Medication] purchased Allscripts's pre-packaged medication fulfillment solutions business (the "Medication Business"), Riverview began purchasing medication from A-S [Medication]....I was aware that Allscripts sold its Medication Business to A-S [Medication], and considered A-S [Medication] to be a continuation of Allscripts's Medication Business because it was the same business, just with a different owner.

(Smith Dec., ¶¶ 1, 3-5).

Many putative class members gave Allscripts permission to send them information about Allscripts's various products via fax. (*See, e.g.,* Jones Aff., ¶ 3; Oliver Aff., ¶ 3; Jones Aff., ¶ 3; Smith Dec., ¶¶ 6-8; Lucas Dec., ¶ 5). And, they considered the consent they gave Allscripts to receive fax advertisements to also extend as consent given to A-S Medication to receive fax advertisements, as they considered A-S Medication simply to be a continuation of Allscripts's MSG. For example, Cathy Jones, an administrator for one of the putative class members, explained:

> I consented to receive Allscripts' product information via fax at the beginning of our business relationship....I considered the consent previously provided to Allscripts [to send fax advertisements] extended to A-S Medications. I again consented to receive information about A-S Medications products and services via fax....

(Jones Aff., ¶¶ 3, 5).

Similarly, Jeannine Oliver, the office manager for another putative class member, attested:

> I consented to receive Allscripts' product information via fax at the beginning of our business relationship....When OFH [putative class member] provided its fax number to Allscripts, it agreed to and consented to receive faxes from Allscripts regarding Allscripts' products and services. I considered the consent that I previously provided to Allscripts extended to A-S Medications as it appeared to me to be a continuation of the same business.

(Oliver Aff., ¶¶ 3, 7). And, Lindsey Williams, a director for another putative class member, stated: "Stern [putative class member] agreed to and consented to receive faxes from Allscripts

regarding Allscripts' products and services. I considered the consent that I previously provided to Allscripts extended to A-S Medications." (Williams Aff., ¶ 5). And, Smith explained:

> I do not specifically recall Riverview [putative class member] ever receiving fax advertisements from Allscripts or A-S. However, if Riverview did receive any fax advertisements from Allscripts or A-S, I would have given Allscripts and A-S permission to send Riverview those fax advertisements.

(Smith Dec., ¶ 7). Similarly, Debra Lucas, the purchasing manager for a putative class member, stated:

> While I do not specifically recall giving Allscripts or A-S permission to send DAK fax advertisements, given my custom, practice and experience in dealing with Allscripts and A-S, I can attest that I would have given Allscripts and A-S permission to send DAK faxes advertising their products and/or services.

(Lucas Dec., ¶ 5).

Putative class members also specifically gave A-S Medication permission to send them fax advertisements because they wanted to stay apprised of A-S Medication's products. (*See, e.g.,* Oliver Aff., ¶¶ 6-7; Williams Aff., ¶¶ 4-5; Jones Aff., ¶¶ 5-6; Smith Dec., ¶¶ 7-8). And, putative class members did not ever ask Allscripts or A-S Medication to stop sending them fax advertisements. (*See, e.g.,* Oliver Aff., ¶ 8; Williams Aff., ¶ 6; Jones Aff., ¶ 7; Smith Dec., ¶ 9; Lucas Dec., ¶ 7).

### G. The Fax At Issue

The document attached as Exhibit A to the First Amended Complaint—which is the sole basis for all of Plaintiff's claims—advertises a new A-S Medication product, PedigreeRx, that A-S Medication started marketing in early 2010. (*See* Dkt: # 38-1; Hoff Dep., p. 41). PedigreeRx was a web-based software that was a newer version of an existing MSG product—TouchScript[TM]—that A-S Medication acquired from Allscripts:

Q:     What is TouchScripts?

A:    I guess I should rephrase that.  I don't know exactly what it is, but I know it's a program that Allscripts started, and I know we're trying to upgrade TouchScripts for subscribers to – or prescribers to PedigreeRx.

\*\*\*

Q:    So PedigreeRx was an A-S product?

A:    Correct.

Q:    Okay.  And if I understand your testimony just a moment ago, A-S was trying to convert former TouchScripts customers to use PedigreeRx?

A:    Correct.

Q:    And why – why did A-S want to convert them from TouchScripts to PedigreeRx?

\*\*\*

A:    I think it was just a better – a newer system.

(McElroy Dep., pp. 145-146; *see also* APA, p. 6).

The fax advertisement was intended to inform A-S Medication's and Allscripts's customers and prospective customers about PedigreeRx and get them to upgrade to or purchase this new product. (McElroy Dep., pp. 145-146; *see also* Dkt. # 38-1; Hoff Dep., pp. 65-66).

Exhibit A was faxed to a list of A-S Medication and Allscripts customers and prospective customers that was generated from Allscripts's Salesforce database. (*See, e.g.,* A-S 30(b)(6) Dep., p. 26). A digital forensic analysis shows that fax numbers from the A-S Medication fax log for the February 2010 fax transmission at issue in this matter matched fax numbers and other corresponding data in Allscripts's Salesforce database. (Transcript of Yaniv Schiff Deposition, attached hereto **as Exhibit R**, pp. 34-38; Hoff Dep., p. 37). The entities on that fax list had provided Allscripts permission to send them faxes about Allscripts's various products, which included Allscripts's MSG. (Hoff Dep., pp. 17, 21-22; *see supra* II.A.2-4; II.B-C).

A-S Medication, as a continuation of Allscripts's MSG, had permission to send a fax advertisement to this list pulled from Allscripts's Salesforce database. As Hoff explained:

> Q: For all the different type – for all of the different ways that Allscripts could obtain consent, to your knowledge, did Allscripts ever seek consent for A-S to fax advertisements?
>
> A: As I said, we were a continuation of the business. They continued to represent us in the market. They were selling our products. We were jointly in the same trade booths together and all that, so it was viewed as on continuing company.
>
> …
>
> Q: Would it be accurate to say that A-S never directly contacted the target list that generated off the Salesforce database as provided by Allscripts to seek prior express invitation or permission to send fax advertisements?
>
> A: We didn't need to. We were part of Allscripts' joint marketing arrangement.
>
> Q: Okay. So you're saying you obtained the consent from Allscripts?
>
> A: Through our relationship with Allscripts.

(A-S 30(b)(6) Dep., pp. 20, 22).

## III.  ARGUMENT

### A.  Requirements For Class Certification

Plaintiff's request for class certification is governed by Fed. R. Civ. P. 23.  Under Rule 23, Plaintiff bears the burden of demonstrating that class certification is appropriate.  "To be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a)— numerosity, commonality, typicality, and adequacy of representation—and one subsection of Rule 23(b)." *Id.* (citing *Harper v. Sheriff of Cook Co.,* 581 F.3d 511, 513 (7th Cir.2009); *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006)).

"A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous

parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). In analyzing Plaintiff's request for class certification, this Court must "make whatever factual and legal inquiries are necessary under Rule 23." *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir.2001). This will "frequently . . . entail some overlap with the merits of Plaintiff's underlying claim" as "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551-52 (quoting *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160 (1982)).

Here, Plaintiff seeks certification pursuant to Rule 23(b)(3). For a class to be certified pursuant to Rule 23(b)(3), the "class must meet two requirements beyond the Rule 23(a) prerequisites: common questions of law or fact must 'predominate over any questions affecting only individual members,' and class resolution must be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Brink's Mfg. Co.,* 2011 WL 248511, at *7 (quoting Fed. R. Civ. P. 23(b)(3)). "The Supreme Court has made clear . . . that 'the predominance criterion is far more demanding' than 'Rule 23(a)'s commonality requirement.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

"[T]he question whether common questions predominate is necessarily a case-specific one." *Id.* at * 8. To resolve the issue, "'a district court must engage in a case-specific analysis that goes outside of the pleadings in order to formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate *in a given case*.'" *Id.* (quoting *New England Carpenters Health Benefits Fund v. First Databank, Inc.,* 244 F.R.D. 79, 84 (D.Mass.2007)(emphasis added).

### B. Consent—the Predominant Issue—Must Be Resolved Individually For Each Putative Class Member

In TCPA cases, when evidence demonstrates that consent cannot be resolved through generalized or class-wide evidence, but instead must be resolved through inquiry into facts and circumstances unique to each individual putative class member, a plaintiff "fail[s] to meet his burden under Rule 23(b)(3) because individual issues predominate over common ones." *Jamison*, 290 F.R.D. 92, 107 (N.D. Ill. 2013); *see also Brink's Mfg. Co.*, 2011 WL 248511 at *8; *Fields v. Mobile Messengers Am., Inc.*, No. C 12-05160 WHA, 2013 WL 6073426, at *4 (N.D. Cal. Nov. 18, 2013)("Thus, *even if* consent is an affirmative defense, individualized inquiries regarding consent remain. Plaintiffs have failed to prove predominance under Rule 23(b) and their motion to certify a nationwide text-receipt class is hereby **Denied.**")(emphasis in original).

Undisputed evidence confirms that Allscripts obtained consent prior to sending faxes promoting Allscripts' goods and services. (*See supra* II.A.3-4). Brian Moffett is currently the direct of product support at Allscripts and has been employed by Allscripts for 21 years. (Moffett *A-S* Dep., p. 6). Moffett, who is familiar with Allscripts's business practices and with how Allscripts keeps track of its customers, testified that Allscripts always asked permission prior to sending faxes promoting its goods and services. (*Id.* at 45-46; *see also* Moffet *Allscripts* Dep., pp. 51, 39-40, 43, 65-66). According to Moffett, Allscripts had a policy and practice of obtaining consent prior to sending any promotional or informational faxes to clients or prospects. (Moffett *A-S* Dep., pp. 45-46). Moffett also noted that Allscripts' clients and prospects frequently requested information regarding Allscripts' products and services via fax. (*Id.* at 45). Putative class members also confirmed that they consented to receive fax advertisements from Allscripts. (*See supra* II.F).

At the time Allscripts obtained consent from many putative class members to send faxes

about its various products and services, the MSG was still a part of Allscripts. (See, e.g., Williams Aff., ¶ 2; Jones Aff., ¶¶ 2-3; Oliver Aff., ¶¶ 2-3; APA, p. 5). Thus, the consent secured by Allscripts was broad enough to encompass products and services marketed and sold by Allscripts's MSG. This is confirmed by the fact that Allscripts sent fax advertisements marketing products and services offered by its MSG *prior* to divesting the business. (Cull Aff., ¶ 3; *see also* Exemplar Allscripts MSG Fax, attached hereto as **Exhibit S**). It is further confirmed by affidavits from putative class members indicating that they provided general consent to receive faxes "regarding Allscripts' products and services," as opposed specific consent to receive specific faxes or only faxes offering certain specific goods or services. (*See, e.g.,* Williams Aff., ¶ 2; Oliver Aff., ¶ 7; Jones Aff., ¶ 2-3; Smith Dec., ¶¶ 6-8; Lucas Dec., ¶ 5).

In March 2009, after Allscripts had obtained consent from many putative class members to send the fax advertisements regarding its various products, Allscripts sold its MSG to A-S Medication. (*See* APA, p. 5). A-S Medication purchased "all property and assets primarily used in or primarily held for use in" the MSG, and also assumed "all liabilities and obligations…primarily relating to or arising out of the [MSG] Business or the Assets…." (*Id.* at 13-15, 17). Depending on the scope and context of the consent provided by putative class members, consent given to Allscripts to receive fax advertisements (which was broad enough to encompass goods and services marketed by the MSG) may have been broad enough to encompass subsequent faxes from A-S Medication.

Class members who consented to receive fax advertisements regarding products and services offered by Allscripts's MSG may have intended or expected that the consent they provided would include faxes sent by the business successor of the MSG. From the customer's perspective, there was little—if any—difference between Allscripts's MSG and A-S Medication.

21

(*See supra* II.F). As Oliver explained, she learned that the MSG portion of Allscripts's business was sold in 2009 and she was told to use a new tax identification number when paying for medication products and services, but "[o]therwise this information made no difference to me." (Oliver Aff., ¶ 5). According to Oliver, A- S Medication "appeared to me to be a continuation of the same business."  (*Id.* ¶ 7; *see also* Smith Dec., ¶ 5 ("I was aware that Allscripts sold its Medication Business to A-S, and considered A-S to be  continuation of Allscripts' Medication Business because it was the same business, just with a different owner."); Lucas Dec., ¶ 5 (same).

To determine whether the consent each putative class member provided was broad enough to encompass subsequent faxes by A-S Medication, the finder-of-fact will have to consider: (1) the facts and circumstances surrounding consent, (2) the intent of each putative class member when providing consent, (3) the context in which each putative class member provided consent, and (4) the putative class members' understanding of Allscripts, Allscripts's MSG, and the sale of the MSG to A-S Medication. A number of courts have explained that the scope of consent is an issue that must be resolved based on the purpose of the consent and the context in which consent was provided. *See, e.g., Kolinek*, 2014 WL 3056813 at * 4 ("the scope of a consumer's consent depends on its context and the purpose for which it is given."); *Olney v. Job.com, Inc.*, No. 1:12-CV-01724-LJO, 2014 WL 1747674, at *6 (E.D. Cal. May 1, 2014)("Under the TCPA, the scope of an individual's express prior consent governs who may call that individual and the purpose for doing so."); *see also Aderhold v. Car2go N.A., LLC*, No. C13-489RAJ, 2014 WL 794802, at *5 (W.D. Wash. Feb. 27, 2014)(noting a number of decisions in which the court focused "on the nature of the transaction in which a consumer provides her cellular number to determine the scope of 'her prior express consent'").  As the Sixth Circuit has

explained with regard to determining the scope of consent, "the context of the consent provided is critical." *Baisden v. Credit Adjustments, Inc.,* 813 F.3d 338, 343 (6th Cir. 2016).

The FCC, through a series of orders, has confirmed that the scope and nature of consent depends on the purpose and context of the consent. *See Kolinek*, 2014 EL 3056813 at * 2-4 (summarizing a number of FCC orders[1] addressing the issue of consent and explaining that, "to the extent the FCC's orders establish a rule, it is that the scope of a consumer's consent depends on the its context and the purpose for which it is given."). The FCC also noted in a recent order that "the scope of consent must be determined upon the facts of each situation." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7990 (2015).

Courts properly treat the issue of consent as an issue of fact. *Olney*, 2014 WL 1747674, at *6. Courts have repeatedly recognized that, depending on the context and purpose for which it was provided, consent may be broad enough to encompass faxes sent by a third party. As the court in *Olney* explained, "[a]n individual may indirectly provide a third-party with express consent to be called under the TCPA." 2014 WL 1747674, at *6; *see also Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100, 1107 (N.D. Cal. 2014) *aff'd*, No. 14-55293, 2016 WL 424778 (9th Cir. Feb. 3, 2016)(plaintiff who voluntarily provided cell phone number to airline "consented to be contacted on her cellphone about flight-related matters," and text message sent by airline's third-party vendor offering to provide flight information "fell within the scope of her 'prior express consent.'"); *Schwartz-Earp v. Advanced Call Ctr. Techs., LLC*, No. 15-CV-01582-MEJ, 2016

---

[1] In *Kolinek*, when the factual nature of the inquiry needed to resolve the scope of consent, the court considered a number of FCC orders, including: *In re Rules and Regs. Implementing Tel. Consumer Protection Act of 1991,* 23 FCC Rcd. 559 (Jan. 4, 2008); *In re Rules and Regs. Implementing Tel. Consumer Protection Act of 1991,* 27 FCC Rcd. 1830 (Feb. 15, 2012) and *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 30 FCC Rcd. 7961 (2015).

WL 899149, at * 7 (N.D. Cal. Mar. 9, 2016)("Plaintiff's act of providing her cellphone was a voluntary act, she was not forced to obtain the credit card. Thus, under the FCC's interpretation of the TCPA, she consented to be contacted on her cellphone about matters related to her credit card, including by third-party debt collectors."); *Chavez v. Advantage Group*, 959 F. Supp. 2d 1279 (D. Colo. 2013)(by providing cell phone number to health care provider, plaintiff consented to be called by third-party debt collector about the debt plaintiff owed to the health care provider).

These rulings are consistent with the FCC's interpretation of consent. In a 2014 order, the FCC explained that "consent to be called at a number in conjunction with a transaction extends to a wide range of calls 'regarding' that transaction, even in at least some cases where the calls were made by a third party." *Matter of Groupme, Inc./skype Commc'ns S.A.R.l Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 29 F.C.C. Rcd. 3442, 3446 (2014).

Here, Defendants are not arguing that Allscripts specifically obtained express consent for A-S Medication to send fax advertisements *after* Allscripts divested the MSG. Rather, Defendants are arguing that at the time Allscripts received consent from putative class members to send them fax advertisements, that consent was broad enough to encompass products and services sold by Allscripts's MSG. Allscripts routinely obtained general consent to advertise various products to its customers and prospective customers. (*See supra* II.A.3-4). Depending on the context and purpose of the consent provided by putative class members, consent may also have been broad enough to extend to A-S Medication, the successor to Allscripts's MSG.

While it was part of Allscripts, the MSG relied on Allscripts's marketing and sales staff to market goods and services offered by the MSG. (Cull Aff., ¶ 3). Allscripts's marketing was so

24

critical to the MSG that the parties entered into a Marketing Agreement when Allscripts divested the MSG. (*See generally* Marketing Agreement). In the Marketing Agreement, the parties acknowledged that a material portion of the consideration that A-S Medication paid for the MSG was "the continuing provision by Allscripts of the Marketing Services." (*Id.* at 1). Under the terms of the Marketing Agreement, A-S Medication agreed to pay Allscripts $3,600,000 annually for marketing services. (*Id.* at 3). In exchange, Allscripts agreed to provide an array of marketing services, including actively promoting A-S Medication's products to Allscripts's existing and new clients. (*Id.*). Allscripts spent considerable time and effort marketing and promoting goods and services sold by its MSG prior to the sale of the MSG to A-S Medication, and agreed to continue doing so after the sale. (*See supra* II.B-C).

Determining the scope of consent will require inquiry into the purpose and context of consent, the putative class members' intent, and other individual issues. This type of individual inquiry means that common issues do not predominate. As a result, Plaintiff cannot satisfy the Rule 23(b)(3)'s requirements for class, and certification should be denied.

### C.    The Retroactive Waiver Applies To The Faxes At Issue

Plaintiff attempts to avoid the individual issue of consent by arguing that, in this case, consent is irrelevant. Specifically, Plaintiff claims that regardless of consent, every putative class member still has a claim against A-S Medication for failing to include opt-out language on the faxes as required by 47 C.F.R. 64.1200(a)(4)(iv). (*See* Dkt. 147-1, p. 9). Thus, according to Plaintiff, there is no need to distinguish between putative class members who consented to receive faxes and those who did not.

Plaintiff's argument should be rejected.  As Plaintiff acknowledges, A-S Medication was granted a retroactive waiver of the requirements set forth in 47 C.F.R. 64.1200(a)(4)(iv) for faxes

sent with prior express consent. (*Id.*). The Consumer and Governmental Affairs Bureau of the FCC—the agency Congress charged with construing and administering the TCPA—granted A-S Medication a retroactive waiver of Section 47 C.F.R. 64.1200(a)(4)(iv)'s requirements for all faxes sent with prior express permission. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 8598, 8602 (2015)("Bureau Order")("we grant waivers to parties similarly-situated to the initial waiver recipients granted relief by the Commission due to uncertainty whether the opt-out notice requirement applies to faxes sent with recipient consent."). The retroactive waiver was granted on August 28, 2015 and applies to the faxes at issue in this lawsuit.

In issuing the retroactive waiver, the Consumer and Governmental Affairs Bureau relied on an earlier order from the FCC that granted a number of other petitioners retroactive waivers of 47 C.F.R. 64.1200(a)(4)(iv)'s requirements for faxes sent with consent. *See* Bureau Order, 30 F.C.C. Rcd. at 8603-4. In its order, the FCC concluded that retroactive waivers were in the public interest because there was confusion regarding whether the opt-out notice requirement applied to faxes sent to recipients who had provided prior express permission for such faxes. *See In The Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("Anda Commission Order"), 29 F.C.C. Rcd. 13998, ¶¶ 22-31 (2014). This confusion was created by a footnote in the order that states "the opt-out notice requirement only applies to communications that constitute *unsolicited* advertisements." *Id.* ¶ 24 (quoting *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, Junk Fax Prevention Act of 2005*, 21 F.C.C. Rcd. 3787, at 3810, n. 154 (2006)). In addition, the FCC acknowledged that there was a lack of explicit notice that the order required opt-out language on faxes sent with prior express permission, which may have contributed to the confusion. *Id.* ¶ 25.

26

Plaintiff does not challenge the FCC's Anda Commission Order or the Bureau Order granting A-S Medication a retroactive waiver of 47 C.F.R. 64.1200(a)(4)(iv)'s requirements for faxes sent with express consent. Instead, Plaintiff argues that the waivers only apply to FCC enforcement actions, and not to private rights of action such as the instant matter. (Dkt. # 147-1, p. 9). Plaintiff's argument, which is purportedly based on the separation of powers, is at odds with the Bureau Order, which provides:

> At the outset, we dismiss arguments that by granting waivers while litigation is pending violates the separation of powers as several commenters have suggested. As the Commission has previously noted, by addressing requests for declaratory ruling and/or waiver, we are interpreting a statute, the TCPA, over which Congress provided the Commission authority as the expert agency. Likewise, the mere fact that the TCPA allows for private rights of action to enforce rule violations does not undercut our authority, as the expert agency, to define the scope of when and how our rules apply.

Bureau Order, 30 F.C.C. Rcd. at 8609.

Plaintiff's argument has also been rejected by at least two district courts that have applied retroactive waivers in private party litigation. *See Simon v. Healthways, Inc.*, No. CV1408022CX, 2015 WL 10015953 (C.D. Cal. Dec. 17, 2015); *Bais Yaakov of Spring Valley v. Graduation Source, LLC*, No. 14-CV-3232 (NSR), 2016 WL 1271693 (S.D.N.Y. Mar. 29, 2016).

In *Simon v. Healthways, Inc.*, the court considered whether the FCC had authority to issue a retroactive waiver of Section 1200(a)(4)(iv) and whether the retroactive waiver was limited to FCC enforcement actions. 2015 WL 10015953, at *7. The court first concluded that "the FCC has the authority to grant such a retroactive wavier." *Id*. In so doing, the court noted that: (1) Congress had delegated authority to execute and enforce the TCPA to the FCC; (2) the FCC remains the authoritative interpreter (within limits of reason) of the TCPA; and (3) the FCC has authority to waive its rules if there is good cause to do so. *Id.* The court further noted that the retroactive waiver was related to the FCC's own regulation—and not the TCPA itself—because

27

the plain language of the TCPA only required opt-out notices on *unsolicited* advertisements. *Id*. Accordingly, the court concluded that the FCC waiver applied to private litigation. *Id*. And, despite the lack of compliant opt-out language on the faxes at issue, applying the retroactive waiver, the court concluded that individual issues of consent predominated and denied the plaintiff's request for class certification. *Id*. at * 7-8.

At least one other court has agreed with *Simon*. *See Bais Yaakov of Spring Valley*, 2016 WL 1271693, at *5 ("the Court is persuaded by the analysis undertaken in *Simon*"). In *Bais Yaakov*, the court reviewed both *Simon* and *Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 65 F. Supp. 3d 482 (W.D. Mich. 2014)—the decision Plaintiff now relies on to argue that the retroactive waiver only applies to FCC enforcement actions. *Id*. The court ultimately agreed with the analysis set forth in *Simon*, explaining:

> the Court is persuaded by the analysis undertaken in *Simon*. The Waiver does not, as Plaintiff contends, retroactively release Defendants from *statutory* liability. As stated previously, on its face the TCPA only prohibits the sending of unsolicited faxes. It is the FCC's regulation interpreting the TCPA that extends the protections of the statute to solicited faxes. Thus, it is within the FCC's authority to determine when and how to apply this regulation, and to waive it for good cause.

*Bais Yaakov,* 2016 WL 1271693 at * 5.

This Court should adopt the well-reasoned analysis set forth in the Bureau Order, *Simon*, and *Bais Yaakov* and conclude that the retroactive waiver granted to A-S Medication applies to the faxes at issue in this litigation. While Plaintiff argues that this issue need not be resolved now, resolution of the issue is crucial to deciding whether or not a class can be certified. *See Simon*, 2015 WL 10015953, at * 7 ("'The Waiver Order itself states prior express consent "remains a question for triers of fact in the private litigation.' As such, prior express permission is a critical—and individualized—issue in this class action.")(citations omitted). Here, as in

28

*Simon*, prior express consent is the predominate—and individualized—issue in this case. *Id*. And, if the retroactive waiver applies, certification should be denied. *Id*.

## IV.   CONCLUSION

For the foregoing reasons, Defendants A-S Medication Solutions, LLC, James Barta, and Walter Hoff respectfully request that this Court deny Plaintiff's Motion for Class Certification and grant any other relief this Court deems necessary and proper.

Respectfully submitted,


/s/ Eric L. Samore
One of Defendants' Attorneys


Eric L. Samore
Albert Bower
Yesha Hoeppner
SMITHAMUNDSEN LLC
150 N. Michigan Avenue #3300
Chicago, IL 60601
(312) 894-3251

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 13, 2016, he served a copy of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification upon all counsel of record via the Court's ECF filing system:

<blockquote>

[x]    Pursuant to 28 USC Section 1746(2), I certify under penalty of perjury that the foregoing is true and correct. Executed on:  May 13, 2016.

/s/ Eric L. Samore       

</blockquote>